**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT KNOXVILLE**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **NO. 3:16-CR-35 [RLJ-CCS]** |
| | ) | |
| **THOMAS ALLAN SCARBROUGH,** | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S OBJECTION TO MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION DENYING MOTION TO SUPPRESS**

Comes the Defendant, Thomas Allan Scarbrough, by and through counsel, and submits the following objection to the Report and Recommendation issued by the Honorable C. Clifford Shirley, Jr., United States Magistrate Judge, on August 26, 2016. [Doc. 28].

## I. <u>Standard of Review</u>

Pursuant to Rule 59(b)(2) of the Federal Rules of Criminal Procedure, a party may serve and file objections to a magistrate judge's order on a dispositive pre-trial motion within fourteen (14) days after being served with a copy. Fed. R. Crim. P. 59(b)(2). The district judge must consider de novo any objection to the magistrate judge's recommendation. Fed. R. Crim. P. 59(b)(3). Importantly, the Advisory Committee Notes on the parallel Rule of Civil Procedure provide that "the term "de novo" signifies that the Magistrate's findings are not protected by the clearly erroneous doctrine . . . ." Advisory Committee Notes to Fed. R. Civ. P. 72, 1983 Addition, Subdivision (b). <u>See also</u> <u>United States v. Raddatz</u>, 447 U.S. 667 (1980). Thus, the district judge has wide discretion in conducting a review and may accept, reject, or modify the recommendation, receive further evidence, or resubmit the matter to the magistrate judge with instructions. <u>Id.</u> Fed. R. Crim. P. 59(b)(3).

On August 26, 2016, Magistrate Judge Shirley entered a Report and Recommendation denying the Defendant, Thomas Allan Scarbrough's Motion to Suppress. [Doc. 28]. The Defendant hereby objects to the Magistrate's denial of the Motion to Suppress.

## II.    Statement of Facts

The charges brought in the instant case involve the grant and execution of two warrants that led to the instant charges. The charges at issue hinge upon a search warrant executed upon the Accused, Thomas Scarbrough's home in Rockwood, Tennessee on October 20, 2015 ("Residential warrant"). The Affidavit in support of this warrant on the Accused's residence, was based primarily upon information obtained from an earlier warrant issued in the Eastern District of Virginia ("NIT warrant").

The initial investigation of the Defendant began with the Government's interception and decision to maintain a website, referred to as "Website A", now known to be Playpen. Following the Government's seizure of the site, the FBI sought a warrant to employ network investigative techniques "NIT's" to the computers of all users that logged onto the site which was issued by a magistrate in the Eastern District of Virginia on February 20, 2015. Pursuant to the NIT warrant, on February 28, 2015 an NIT was issued to the Defendant's computer, which subsequently relayed identifying information including both the IP address and logs of activity, back to the FBI. The information provided by execution of the NIT warrant led to the identification of the Accused, which was then used in the application for the Residential warrant executed on October 20, 2015 at his Rockwood home.

As a result of the fruits of the NIT and Residential warrants, Mr. Scarbrough was charged in a two (2) count Indictment on March 8, 2016 charging him with the knowing

distribution of child pornography in violation of 18 U.S.C. §2252(a)(2)(A) and possession of child pornography in violation of 18 U.S.C. §2256(8)(B).

The Accused filed a Motion to Suppress [Doc. 14] on April 21, 2016 asking the Court to suppress all the evidence seized in the execution of the Residential Warrant arguing the basis of probable cause was the illegal NIT warrant issued from Virginia. The United States responded opposing suppression [Doc. 19] on May 23, 2016. The Accused then replied [Doc 20] on June 6, 2016. Arguments by counsel were heard on June 15, 2016. A Report and Recommendation denying suppression of evidence [Doc. 28] was filed on August 28, 2016 by the Honorable C. Clifford Shirley, Jr. The Report and Recommendation noted in pertinent part as follows:

> The Court finds that the deployment of the NIT pursuant to the Virginia warrant to the Defendant's computer in the Eastern District of Tennessee violated the Fourth Amendment and Federal Rule of Criminal Procedure 41(b) because the issuing magistrate judge from the Eastern District of Virginia lacked authority to authorize a search of the Defendant's computer, which was located outside the Eastern District of Virginia. However, the Court also finds that the evidence seized pursuant to both the Virginia search warrant and the search of the Defendant's residence should not be excluded because the executing law enforcement officers acted in good faith.

[Doc 28, p.2]

The Accused hereby objects to the ultimate findings of the Report and Recommendation, noting that the Court properly found violations of the Fourth Amendment and Federal Rule of Criminal Procedure 41(b), however erred in determining suppression was not warranted in the instant case.

**III.** **Objection to the Denial of Defendant Thomas Scarbrough's Motion to Suppress [Doc. 14]**

**A. The Court Correctly held that the NIT Warrant was a Violation of the Fourth Amendment**

The Court noted that the initial and central question in addressing a question of suppression centers upon the determination of whether a "search" within the meaning of the Fourth Amendment took place that would allow a challenge to the evidence. The first question in making this determination is whether the Accused had a "reasonable expectation of privacy" in the place or thing searched. [Doc 28, p. 9, citing Rakas v. Illinois, 439 U.S. 128, 143 (1967)]. The determination of a reasonable expectation of privacy looks to both the subjective expectations of the accused and also the level of reasonableness of that expectation within society. California v. Ciraolo, 476 U.S. 207, 211 (1986) (citing Katz v. United States, 389 U.S. 347, 360, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967)).

In applying these constitutional principles to the fact of the instant case, the Court analyzes the implications of the search of the Defendant's computer for information by the NIT warrant. While recognizing the current split among districts in case law analyzing this very same warrant, the Court noted that generally an individual does not have a reasonable expectation of privacy in their IP address once exposed to a third party. [Doc. 28, p.10, citing Guest v. Leis, 255 F.3d. 325, 336 (6th Cir. 2001)]. Significantly, the Court noted that there was an additional factor relevant to the analysis, citing to the United States Supreme Court decision in U.S. v. Jones, 132 S. Ct. 945, 950-951(2012). Jones noted that, in light of the evolution of technology and the subsequent rapid changes to societal expectations, the location searched can also implicate Fourth Amendment protections. Id.

In the instant case, the Court noted that while the information gathered was not subject to a reasonable expectation of privacy, the location searched, the Accused's computer, was subject to that expectation and thus implicated Fourth Amendment protections against unreasonable searches. [Doc. 28, p.11, citing Riley v. California, 134 S.

Ct. 2473, 2492-93 (2014)]. The Court correctly held that the issuance of the NIT onto the Accused's computer was a "search" implicating the protections of the Fourth Amendment.

Next, the Court analyzed whether the issuance of the NIT warrant violated the Fourth Amendment. The warrant requirements under the Fourth Amendment are well established, requiring probable cause supported by oath, particularity of location to be searched, and issuance by a "neutral and detached magistrate." Johnson v. United States, 333 U.S. 10, 14 (1948). As applied to the instant case, the Court noted that the NIT warrant was both supported by probable cause and sufficiently particular in its description of the persons or places to be searched. [Doc. 28, p.14]. The Court noted however, that the NIT warrant failed as to the neutral and detached magistrate requirement, noting the authority to issue the warrant was key in this determination. [Doc 28, p.14, citing United States v. Scott, 260 F.3d 512, 515 (6th Cir. 2001). The Court correctly held that because the United States Magistrate Judge in Virginia lacked authority to issue the NIT warrant, its issuance and execution resulted in a violation of the Fourth Amendment's protections against warrantless searches.

### B. The Court properly held that the Issuance of NIT Warrant violated Rule 41(b)

The authority of a magistrate judge to issue a warrant is specifically proscribed by Fed. R. Crim. P. 41(b). Rule 41(b) sets out five specific circumstances in which a magistrate judge has authority and jurisdiction to issue a warrant. Significantly, the NIT warrant issued by a United States Magistrate Judge in Virginia that stretched to search computers located across the nation and also the world clearly did not fit within any of these proscribed circumstances.

The Court, which also highlighted the almost unanimous agreement of other courts to analyze this question, correctly noted that the NIT warrant violated Rule 41(b) because the magistrate judge totally lacked authority to issue a warrant to search property outside her district. [Doc. 28, p.16]. Again, the Court reiterated that the total lack of authority constituted both a violation of Rule 41(b) and the Fourth Amendment protection against warrantless searches.

**C. Suppression was required to remedy the Fourth Amendment Violation**

As noted above, the Court properly reached the conclusion that the NIT warrant violated both the Fourth Amendment of the United States Constitution and Rule 41(b) of the Federal Rules of Criminal Procedure. After determining there has been a Fourth Amendment violation, the next question a court must address is the appropriate remedy for the violation. In the instant case, the Court held that the violation of the Fourth Amendment did not require exclusion of the evidence obtained. The Defendant objects to this finding.

The Court in the Report and Recommendation noted, in pertinent part,

As discussed above, the undersigned agrees that the Virginia warrant is void because it was issued by a judge without authority. Our appellate court has held that "'when a warrant is signed by someone who lacks the legal authority necessary to issue search warrants, the warrant is void *ab initio*.'"

[Doc. 28, p.19-20, citing United States v. Master, 614 F.3d 236, 241 (6th Cir. 2010) (quoting United States v. Scott, 260 F.3d 512, 515 (6th Cir. 2001), abrogated in part my Master)]

In recognizing the NIT warrant at issue was *ab initio*, the Court noted that the Sixth Circuit in United States v. Master was now the controlling precedent which had modified the previous standard for *ab initio* warrants in the circuit set out in United States v. Scott. Master, 614 F.3d at 241; Scott, 260 F.3d at 515. Under the *ab initio*

6

logic set out in <u>Scott</u> and recognized in many other jurisdictions, the NIT warrant in the instant case would require exclusion because of the inherent lack of authority by the issuing magistrate judge under Federal Rule 41, making the invalid warrant equivalent to a warrantless search. However, the Sixth Circuit in <u>United States v. Master</u>, noted that even a warrant that is void *ab initio* may be saved under the good faith exception in some circumstances. <u>Master</u>, 614 F.3d at 239. <u>Master</u> noted that recent Supreme Court case law, namely <u>United States v. Herring</u>, established a balancing test to determine if the good faith exception would apply to a warrant *ab initio*, rather than automatically excluding evidence seized pursuant to the previous <u>Scott</u> standard. <u>Id</u> at 243. This balancing test requires that the benefits of the deterrence on police conduct outweigh the societal costs of suppression for the court to exclude the evidence at issue. <u>Id</u>. The Sixth Circuit noted that in making this determination, all relevant facts and circumstances should be relevant in the balance of whether to apply the good faith exception. <u>Id.</u> The Court noted that <u>Master</u>, as controlling Sixth Circuit precedent, required the Court to apply the balancing standard rather that automatically excluding evidence as was the standard under <u>Scott</u> and as the Massachusetts District Court did in <u>United States v. Levin</u>. No. 15-10271-WGY(D. Mass. Mar. 20, 2016).

The Court in the instant case, applied the balancing test as set forth in <u>Master</u> and determined that the good faith exception should be applied and suppression was not necessary to cure the Fourth Amendment Violation. The Accused objects to this finding and asks the District Court to reexamine the factors applicable in the determination.

### 1. Application of the <u>Master</u> balancing test was inappropriate

As an initial matter, the Accused would reiterate that a warrant *ab initio* has been recognized as one that is akin to no warrant at all. <u>Master</u>, 614 F.3d at 241. Significantly, <u>Scott</u> and <u>Levin</u> each recognized the necessity of automatic exclusion in protecting Fourth Amendment principles, leaving no room for argument or analysis. While the Court noted it is bound by the precedent set forth in <u>Master</u>, the Accused would urge the Court to reexamine the surrounding analysis of <u>Master</u> in which the Sixth Circuit inappropriately applied precedents in abrogating <u>Scott</u> which is significantly highlighted in both <u>United States v. Levin</u> and <u>Davis v. United States.</u> <u>564 U.S. 229, 258–59 (2011)</u> (Breyer J., dissenting; Ginsburg J. dissenting).

The court in <u>Levin</u> examined the current case law across districts regarding warrants issued *ab initio* and the applicability of the good faith exception to them in its suppression analysis of the same NIT warrant. <u>United States v. Levin</u>, No. 15-10271-WGY(D. Mass. Mar. 20, 2016). The <u>Levin</u> court recognized that the Sixth Circuit has undertaken specific discussion of the good faith exception in such cases, however went on to reject the Sixth Circuit's reasoning stating that the Sixth Circuit "read the Supreme Court's recent good-faith cases too broadly" <u>Id.</u> <u>Levin</u> noted that in reading precedent too broadly, the logic utilized in <u>Master</u> should not have changed the *ab initio* standard:

> Neither Hudson nor Herring—both of which the Master court cited in support of its conclusion that Scott's holding is no longer tenable, see 614 F.3d at 242—requires the conclusion that the good-faith exception applies to evidence seized pursuant to a warrant that was void ab initio.

<u>Levin</u>, No. CR 15-10271-WGY, 2016 WL 1589824, at *11-12.

Significantly, while <u>Levin</u> resides under separate Circuit Court precedent, the propositions regarding the Sixth Circuit's inappropriate reading of <u>Herring</u> are reinforced by a subsequent Supreme Court Opinion. Justices Breyer and Ginsberg noted in a dissenting opinion in <u>Davis v. United States,</u> that the dicta and discussion in <u>Herring</u> and other recent Supreme Court precedents have worked to significantly erode both the exclusionary doctrine and the Fourth Amendment Protections in a way that seems to have been unanticipated, even specifically citing <u>Master</u>'s holding. This commentary highlights the fact that the recent interpretation of <u>Herring</u> and other precedents by the Sixth Circuit are seemingly erroneous as highlighted by the <u>Levin</u> court. Justices Breyer and Ginsberg noted, in pertinent part, as follows:

>  Thus, if the Court means what it now says, if it would place determinative weight upon the culpability of an individual officer's conduct, and if it would apply the exclusionary rule only where a Fourth Amendment violation was "deliberate, reckless, or grossly negligent," then the "good faith" exception will swallow the exclusionary rule. Indeed, our broad dicta in *Herring*—dicta the Court repeats and expands upon today—may already be leading lower courts in this direction. See *United States v. Julius,* 610 F.3d 60, 66–67 (C.A.2 2010) (assuming warrantless search was unconstitutional and remanding for District Court to "perform the cost/benefit analysis required by *Herring* " and to consider "whether the degree of police culpability in this case rose beyond mere ... negligence" before ordering suppression); *United States v. Master,* 614 F.3d 236, 243 (C.A.6 2010) ("[T]he *Herring* Court's emphasis seems weighed more toward preserving **2440 evidence for use in obtaining convictions, even if illegally seized ... unless the officers engage in 'deliberate, reckless, or grossly negligent conduct' " (quoting *Herring, supra,* at 144, 129 S.Ct. 695)). Today's decision will doubtless accelerate this trend.

> Any such change (which may already be underway) would affect not "an exceedingly small set of cases," *ante,* at 2433, but a very large number of cases, potentially many thousands each year. See Valdes, *supra,* at 1728. And since the exclusionary rule is often the only sanction available for a Fourth Amendment violation, the Fourth Amendment would no longer protect ordinary Americans from "unreasonable searches and seizures." See *Wolf v. Colorado,* 338 U.S. 25, 41, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949) (Murphy, J., dissenting) (overruled by *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961)) (In many circumstances, "there is but one alternative to

the rule of exclusion. That is no sanction at all"); *Herring, supra,* at 152, 129 S.Ct. 695 (GINSBURG, J., dissenting) (the exclusionary rule is "an essential auxiliary" to the Fourth Amendment). It would become a watered-down Fourth Amendment, offering its protection against only those searches and seizures that are *egregiously* unreasonable.

Davis v. United States, 564 U.S. 229, 258–59 (2011)(Breyer J., dissenting; Ginsburg J. dissenting).

The Accused would urge the Court to reexamine the United States Supreme Court decisions that fueled the <u>Master</u> decision, including both <u>Herring</u> and also subsequent discussions of the case in <u>Davis</u>. The Court's application of the <u>Master</u> standard was inappropriate, and the Accused would ask the court to adopt the reasoning of <u>Levin</u> and other districts and determine the appropriate remedy for a warrant *ab initio* is exclusion without the application of the good faith exception.

**2. The Court's application of balancing test incorrectly weighed against exclusion**

Despite the reasoning set forth in <u>Levin</u>, the Court in its Report and Recommendation, applied the <u>Master</u> precedent and analyzed the need for suppression in after applying the balancing test set out by the Sixth Circuit. Significantly, even in applying the balancing test to the facts of the instant case, the balance weighs in favor of exclusion of the evidence obtained in violation of the Accused's constitutional rights.

In determining whether the good faith exception may save a Fourth Amendment violation, the court must balance the benefits of deterrence against the societal costs of suppression, taking into account the totality of the circumstances. <u>Master</u>, 614 F.3d at 239. Furthermore, <u>Master</u> noted that the balance typically weighs in favor of the preservation of evidence without a showing of "deliberate, reckless, or grossly negligent conduct by law

enforcement."[1] Id. The Court, in examining the benefits of deterrence in the instant case, emphasized that the deterrence need be aimed at law enforcement noting that "the issuing magistrate's lack of authority has no impact on police misconduct, if the officers mistakenly, but inadvertently, presented the warrant to an incorrect magistrate". [Doc 28, p20, quoting Master, quoting Herring, 555 U.S. at 142.] Significantly, mistaken beliefs of law enforcement and subsequent actions undertaken in good faith are not the situation being evaluated in the instant case. Master, while heavily weighing in favor of the preservation of evidence despite a violation of a citizens' Fourth Amendment rights, does note that "deliberate, reckless, or grossly negligent conduct" by officers *will* weigh in favor of exclusion. Id at 144. In the instant case, the actions of the FBI were precisely that.

The Court in its Report and Recommendation noted that the misconduct in the issuance of the NIT warrant was on the part of the United States Magistrate Judge in Virginia, not the FBI, and thus the deterrent value of suppression on the conduct of law enforcement would be low or non-existent. [Doc. 28, p.21]. The Accused would respectfully disagree, and ask the court to look closely at both the underlying facts and also the reaching implications of such a conclusion.

In the instant case, the FBI was aware, as evidenced by the underlying affidavits that the NIT warrant would stretch far beyond the district of application, but extend across the nation, and likely the world. The Court's argument that the application in the district with the closest physical tie to the case showed good faith by the FBI is uncompelling particularly in light of the sophisticated level of the investigation that was already ongoing. The FBI was

---

[1] Undersigned counsel would again refer the Court to Justices Breyer and Ginsberg's dissent in David v. United States, implying this interpretation of Herring was perhaps not fully intended or anticipated as applied by the Master court. Davis v. United States, 564 U.S. 229, 258–59 (2011)(Breyer J., dissenting; Ginsburg J. dissenting).

well aware that in their application for the NIT warrant they were effectively requesting a warrant without any territorial boundaries or limits. This knowledge is underscored by the language within the supporting affidavit to search computers "wherever located". Regardless of this knowledge and full understanding of the extraordinary nature of this request, which highly trained law enforcement would certainly be aware was atypical, the FBI submitted its affidavit for probable cause and requested a limitless warrant which was subsequently approved by the Magistrate. In this case, there was, as the court noted, certainly an error of judgment and implementation by the Magistrate Judge; however, it is unconvincing to argue that the FBI was simply a naïve party acting in full and good faith reliance on the knowledge of the Magistrate in requesting a warrant of such magnitude. A request of this nature should have been apparent to both law enforcement and the Magistrate Judge in Virginia as expanding far beyond the limitations of criminal procedure and reasonable jurisdictional standards. It is clear that while there is a need for clarity in application of Rule 41 to Magistrate Judges, it is disingenuous to argue that one of the most sophisticated law enforcement units in the nation and likely the world acted in good faith reliance and belief that a request such as the one at issue was legal or "objectively reasonable reliance" as required by the courts. Davis at 238-39. Furthermore, the conduct at issue was not isolated or singular in its effects, rather it spanned the nation and resulted in significant numbers of indictments. Recurring or systemic actions by law enforcement also factor into the analysis of whether good faith should apply. Id at 140. The totality of the surrounding circumstances, the investigation, and the parties involved suggest at a minimum grossly negligent conduct on the part of the FBI which need be deterred in the future, satisfying the Master standard.

Furthermore, the Court in examining the second portion of the balancing test, noted that the instant case is one in which exclusion of evidence would result in substantial societal costs. The Accused objects to this conclusion and asks that the Court examine closely the analysis of the Magistrate Judge in the Report and Recommendation and also the totality of the evolution of these cases across the nation. In examining the societal costs of exclusion, the Court notes that in the instant case the cost of excluding evidence gained from the NIT warrant is high. In reaching this conclusion the Court specifically references the fact that child pornography victimizes some of the most vulnerable members of society, children in using the website Playpen. [Doc. 28, p.23]. Importantly, in analyzing the societal costs of exclusion the costs to the judicial system and society at large are both significant. United States v. Leon, 468 U.S. 897, 908 (1984). As an initial matter, the Accused would noted that while the Magistrate is correct, the type of case should not be determinative in analyzing the societal costs. All crimes affect society, along with all violations of a citizen's rights and the Accused would respectfully request that the Court consider both in making its determination.

One factor that is important in analyzing the societal costs of the potential exclusion are the number of people involved in the issuance of the warrant. While the precise number of resulting prosecutions is unknown to undersigned counsel, estimates in the media have noted over 100 prosecutions as a result of information obtained pursuant to the NIT warrant. There is no doubt that the decisions of courts as to the validity of the NIT warrant and determination of necessity for suppression will spur appeals that will continue over significant periods of time, creating costs to society regardless of suppression or upholding of the evidence at issue in the instant case.

While the costs to the victims of crimes and the toll on the defendant's fighting the legality of the warrant and the courts have all been noted, there are additional societal factors that have been somewhat overlooked by the Court, the costs on the rights of United States citizens. The implications of this warrant's validity and the evolution of the exclusionary doctrine and the good faith exception within the context of this case should also weigh heavily in the balance of societal costs. To grant weight only to the costs to law enforcement and the judiciary and to recognize the costs to vulnerable victims neglects the key demographic in which the Fourth Amendment and the subsequent exclusionary rule were drafted and created to protect; citizens subject to prosecution by the Government. The presumption of innocence, the right to be free of warrantless searches, and the appropriate remedy for those violations are elements that should also be given appropriate weight when determining the societal costs of exclusion and examining the totality of the case and its implications. The United States Supreme Court noted in <u>Davis</u>, that "society must swallow this bitter pill when necessary," noting exclusion of evidence can at times be the only appropriate action. <u>Davis</u>, 564 U.S. at 237. Such a cost has been analyzed as appropriate in a variety of very serious cases over time, all of which have victims, in order to protect the rights of those accused and subject to the deprivation of their liberty by the United States.

In the instant case, the Accused would ask the court to consider the totality of the circumstances in examining the suppression determination, including not only the global implications of the decision in such a specific set of facts, but also the context of other case law in surrounding districts on this specific issue. Here, the Court applied <u>Master</u> when there is support that the interpretation of the court was incorrect in abrogating <u>Scott</u>. Were the <u>Scott</u> standards employed they would require suppression with no assessment of good faith.

14

Additionally, were the Court to apply the balancing test set out in <u>Master</u>, the application would still necessitate suppression in the instant case because the need for deterrence significantly outweighs any arguable societal costs of exclusion. Finally, in examining the totality of circumstances in making a suppression determination, it is essential that the Court also consider the implications of this decision on the rights of citizens and the future actions of law enforcement and magistrate judges.

### D.  Suppression was required to remedy the substantive Rule 41(b) violation

The Court also examined the appropriateness of suppression based upon the violation of Rule 41(b). When addressing the issue of suppression in the context of a Rule 41 violation, the court must find that the violation resulted in prejudice, meaning that the search would not have occurred nor been as abrasive had the rule been followed, or find that there was intentional or deliberate disregard for the rule. See <u>United States v. Searp</u>, 586 F.2d 1117, 1125 (6th Cir. 1978). In examining the underlying facts surrounding the issuance of the warrant, the Court correctly noted that the Defendant suffered prejudice as a result of the violation of Rule 41(b), noting no such search would have occurred but for the violation. [Doc. 28, p.24-25]. The Court noted that while the Defendant suffered prejudice, exclusion is not automatic and the facts are again subject to the balancing test set out in <u>Master</u> and <u>Herring</u>, rejecting the automatic exclusion for a substantive violation employed in <u>Scott</u> and <u>Levin</u>.  <u>Id.</u> Again,, in applying the balancing test, the Court found that the FBI acted in good faith in applying for and executing the NIT warrant and as a result the evidence should not be suppressed. The Accused objects to this finding and notes that the balancing test again weighs in favor of exclusion to remedy the substantive violation of Rule 41(b).

As fully set forth above, the Court's application of the balancing test and determination that suppression was not warranted was incorrect. See Supra III.C.(2). There is a substantial need for dual deterrence in the instant case: first to ensure that law enforcement follows appropriate procedures in seeking warrants as the parties that implement the Rules of Procedure on a daily basis, and secondly, to ensure that Magistrate Judges exercise only their delegated authority set out within the Rules until they are expanded by the appropriate legislative branch.

While the Court correctly notes that the Magistrate Judge erred in granting the warrant, the Court overlooks the intentional conduct by the FBI in seeking a warrant that was clearly outside the bounds of the rules, with no applicable territorial limits. Additionally, while there is some societal cost to exclusion as noted by the Court, the need for clarity in decisions by courts and also the need to settle this area of the law also weigh in favor of exclusion. The enforcement of the Fourth Amendment rights of the Accused, other defendants charged following the execution of the NIT warrant, and generally the rights of citizens charged by the United States all come into play when applying this balance as well. In the instant case, the balancing test weighs in favor of suppression, overcoming the good faith exception as fully set out above.

**E. Suppression was warranted for the Residential warrant pursuant to the Fruit of the Poisonous Tree Doctrine**

The Court in examining the viability of the Residential warrant executed in Tennessee reiterated its finding that the NIT warrant was saved by the good faith exception to the exclusionary doctrine. The Court then noted that the Residential warrant was also executed in good faith, and consequently was not fruit of the poisonous tree. [Doc. 28, p. 26].

The "fruit of the poisonous tree doctrine" has historic roots, and has been recognized to include evidence seized illegally and subsequent evidence gained from an illegal search unless the government can demonstrate that the evidence has been purged of the "primary taint" of the illegal search. Wong Sun v. United States, 371 U.S. 471, 488 (1963). "The essence of that doctrine is that evidence unlawfully obtained, including all derivative evidence flowing from it, should be suppressed." United States v. McClain, 444 F.3d 556, 564, 2005 WL 3947962 (6th Cir. 2005). The Court noted that there are three general exceptions that may save evidence when subject to the fruit of the poisonous tree doctrine: the evidence was discoverable from an independent source, there was sufficient attenuation to purge the initial taint of the violation from the evidence, or the evidence was subject to inevitable discovery. [Doc. 28, p.26, citing United States v. McClain, 444 F.3d 556, 564-566 (2005)]. Importantly, the Court notes that none of these exceptions apply in the instant case, noting that the FBI in fact acknowledged there was no other method to identify website users. Additionally, the Court noted that since the NIT warrants information was the basis for probable cause of the Residential warrant there was no attenuation between the violative search and the secondary warrant whatsoever.

The Court noted that McClain highlighted the existence of certain circumstance in which the Leon good faith exception *could* also apply to evidence that was the subsequent fruit of a Fourth Amendment violation. The Court determined that the conduct of the FBI in executing the NIT warrant was not "objectively unreasonable" and as such was fairly relied upon in application for the Tennessee Residential warrant, applying the good faith exception to the Residential warrant as well. [Doc. 28, p.27].

Significantly, in applying the same good faith standards that have been discussed extensively above, the essential analysis should consider the totality of the circumstances, and the conduct of all officers in making the good faith determination. <u>Master</u>, 614 F.3d at 239. Importantly, the Court agrees that there is a total reliance on the information from the NIT warrant to establish the probable cause for the Residential warrant, showing absolutely no attenuation. The Court notes however, despite the fact that the Residential warrant is based entirely upon the NIT warrant that was deemed to be a violation of both the Fourth Amendment and Rule 41(b) that the facts in the instant case do not necessitate suppression again relying on the good faith exception.

Law enforcement actions here, particularly those of the FBI, were not "objectively reasonable" as the Court finds. See <u>McClain</u> 444 F.3d at 565. The subsequent search warrant executed upon the Accused's residence carried with it the taint of the initial warrant that served as the basis for probable cause. In examining whether the good-faith exception should apply and save the fruits of these violative searches, the Court must again look to the totality of the conduct in the instant case. As argued at length above, the actions of the FBI were not undertaken in good faith. The appeal made in the application for the NIT warrant and supporting affidavit was essentially a hybrid exigency argument set out in the context of a digital age. The FBI was aware that they had a short time to identify users of a website that were otherwise unidentifiable. Moreover, FBI was unable to even point to a general location of such users or any other type of identifying information without the issuance of the NIT warrant. In an attempt for an exigency and desperation argument for a warrant, the FBI effectively laid out the facts to a Magistrate Judge in a plea for a "limited warrant," who accepted their arguments and issued an unprecedented hacking warrant that rapidly spread

NIT's across the world in violation of countless citizens' rights. This conduct by law enforcement, which is neither hidden nor disputed, is the conduct in which the Court continually noted was conducted in good faith, and despite violations of the constitutionally protected rights of the Accused, should be saved and the evidence should be allowed to stand in court.

The Accused would ask the court to examine the true totality of the circumstances of this case and also the wide spread and rippling effects of this decision on not only the Accused and other similarly charged individuals, but also on the citizens of the United States as a whole in making a determination as to the necessity of suppression in this case. Significant violations of both the Fourth Amendment and Rule 41 occurred in this case, depriving a citizen of his right to be protected from warrantless searches. These violations should not be overlooked or cured by an argument that the FBI was not "objectively unreasonable" when there is clear evidence that the FBI at a minimum *should have* and likely did know better, establishing at a minimum culpability sufficient to negate good faith. Master, 614 F.3d at 241. Such actions have been deemed violations and should be treated as such and corrected by exclusion of the evidence that was illegally and unconstitutionally obtained.

Technical advances in society are paced by evolution in the way that law enforcement carries out investigations and develops tactics to pursue those that are suspected of violating laws. It is essential that the Court carefully and completely analyze the propriety of those methods employed by law enforcement, along with the implications of applying a rapidly expanding good faith exception to these new circumstances and tactics. The approval or disapproval of courts will absolutely impact the future conduct and

decisions of both law enforcement and the judiciary who are each monitoring the progress of these cases closely. Decisions such as the ones before this honorable Court have unprecedented deterrent power and potential effect as they mandate the procedures that will be considered legal and acceptable by our judicial system. The need for deterrence in the instant case is essential, and the totality of the circumstances weighs in favor of suppression.

**IV.**     <u>Conclusion</u>

The Magistrate Judge's findings as to the necessity of suppression in the instant case are erroneous. If the Report and Recommendation are allowed to stand, the decision of first impression in this district will become binding precedent that will cement the rights of similar individuals until reviewed by a higher court. The Accused, Thomas Allan Scarbrough, respectfully requests that this Honorable Court exercise its broad discretion under Federal Rule of Criminal Procedure 59(b) and rule that the violations of the Accused's Fourth Amendment Rights and the Substantive violation of Rule 41(b) necessitate suppression of the evidence seized pursuant to both the NIT and Residential warrants.

WHEREFORE, the Accused, Thomas A. Scarbrough, respectfully moves this Honorable Court for an Order granting his *Motion to Suppress.*

RESPECTFULLY SUBMITTED this Friday, September 09, 2016.


/s/ Gregory P. Isaacs
GREGORY P. ISAACS, BPR #013282

THE ISAACS LAW FIRM
618 South Gay Street, Suite 300
Post Office Box 2448
Knoxville, Tennessee 37901-2448
865.673.4953
www.isaacslawfirm.com
Gpi@isaacslawfirm.com

## CERTIFICATE OF SERVICE

It is hereby certified that a true and correct copy of the foregoing pleading was filed electronically and has been served on counsel set forth below, pursuant to the Fed. R. Crim. P., by the U.S.D.C. electronic filing system to carry the same to its destination.

AUSA Matthew T. Morris
United States Assistant Attorney General
Howard H. Baker, Jr. U.S. Courthouse
800 Market Street, Room 211
Knoxville, Tennessee 37902
865.225.1707
Matt.Morris@usdoj.gov

DATED this Friday, September 09, 2016.

 /s/ Gregory P. Isaacs
GREGORY P. ISAACS